

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JD:JPL                                    *271 Cadman Plaza East*
F. #2014R01437                            *Brooklyn, New York 11201*

August 5, 2016

By ECF

The Honorable I. Leo Glasser
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Oswald Lewis
      Criminal Docket No. 14-523 (S-2) (ILG)

Dear Judge Glasser:

The government submits this letter in connection with the defendant Oswald Lewis's sentencing, which is scheduled for August 11, 2016 at 11:00 a.m.[1]  For the reasons set forth below, the government respectfully requests that the Court impose a sentence at the top of, or above, the Guidelines range, which is consistent with the statutory sentencing factors in light of the specific facts of this case.

I.     Background

As the Court is well-aware from having presided over the four-day trial, this case arises from the defendant's violent assaults of Deputy United States Marshals and New York City Police Department ("NYPD") Detectives in an effort to escape being arrested by them.  As established at trial, on the night of August 26, 2014, the Deputies from the United

---

[1] The government notes that the Presentence Sentence Investigation Report ("PSR") was issued on July 29, 2016, which would be less than the required minimum 35 days between disclosure of the PSR and sentencing, assuming that the sentencing hearing is held on the currently scheduled date.  See Fed. R. Crim. P. 32(e)(2).  Although the defendant may waive this minimum period at sentencing, id., in light of the fact that the defendant is pro se and communicates primarily via mail, which, in turn, can be delayed due to his incarceration, the government is currently unaware as to whether the defendant wishes to waive the minimum period or file objections to the PSR.  See Fed. R. Crim. P. 32(f)(1) (parties have 14 days to file objections to the PSR).

States Marshals Service ("USMS") were assigned to a fugitive arrest team to locate and apprehend the defendant.  The defendant had been a fugitive from justice for approximately 20 years.  The Deputies traced the defendant, through his cell phone, to the Springfield Gardens section of Queens, New York.  That night, they were assisted by a team from the NYPD 113 Precinct Detective Squad.  In total, the arrest team consisted of 17 law enforcement officers; 10 from the USMS and 7 from the NYPD.  The Deputies were assigned to make entry into the defendant's residence, while the Detectives would secure the perimeter.  The Deputies on the entry team were equipped with various government issued tactical gear, including bulletproof vests with police and USMS insignia on the front and back, as well as badges.  Two of the Deputies, Inspector Sandy Rao and Deputy U.S. Marshal Patrick Donohue, were ballistic shield operators, carrying bulletproof shields approximately 2 feet wide by 4 feet tall with large "POLICE" and "US MARSHAL" markings.

        The cell phone signal led the 17-member arrest team to a two story house with numerous entrances that were directly accessible from the street, including one entrance at the front, and two side entrances at the middle and back.  The Deputies first approached the middle entrance because the cellular device appeared to be located directly behind that door.  The Deputies loudly knocked on the door and announced themselves as the police.  Detectives in the back of the house could hear the Deputies knocking and announcing on the opposite side, as could the occupant of the front apartment who came to the door in response to the Deputies.  After no one answered the middle door, the Deputies entered and searched that apartment for the defendant, all while continually announcing themselves as the police.

        While the Deputies knocked and announced on the middle door, two Detectives in an alley behind the house observed the lights and air conditioner shut off, as well as a window open, all within the defendant's apartment.  The Detectives relayed this information to the Deputies, who continued to search the middle apartment for the defendant, unsuccessfully, before realizing that the defendant was hiding in the back apartment.  As the Deputies exited the middle apartment and proceeded towards the back entrance, the Detectives in the back alley heard, through the defendant's open bedroom window, the sound of "metal on metal," which they recognized to be the racking of a slide of a gun.  The Deputies knocked on the back entrance, announced themselves as the police, and breached the door with a ram.  The shield operators were the first to enter the defendant's apartment.  The rest of the entry team followed behind them and, together, the Deputies began clearing the defendant's apartment, continuing to announce themselves as the police, and describing what they observed until they reached the only remaining closed door, which led to the defendant's bedroom.

        As the Deputies were about to enter the defendant's bedroom, he yelled out that he was holding a hostage.  In response to the purported hostage situation, the Deputies began back peddling.  The defendant then cracked open the door, aimed a gun at the Deputies, and closed the door.  The Deputies held their fire because they could not see the hostage.  After opening and closing the door a few more times, the defendant opened the door again, aimed, and fired at the Deputies.  Although one Deputy felt bullets fly over her

2

head and others observed muzzle flash from the defendant's gun at very close range, none of the Deputies were shot.

Three Deputies returned fire.  After the exchange of gunfire, the Deputies continued exiting the defendant's apartment.  Meanwhile, the defendant leaned out of his bedroom window with a gun in his hand, aimed at the Detectives who were standing in the alley, and repeatedly fired at them.  None of the Detectives returned fire.  Although one Detective was struck in the face with debris, none of the Detectives were shot.

Shortly thereafter, the defendant announced that he was shot and would surrender to law enforcement.  However, prior to exiting his apartment, the defendant grabbed a bottle of whiskey and began to drink from it.  When the defendant finally came to the entranceway, he had a gun in his hand, which he threw out the door, and was wearing a bulletproof vest.  Following a struggle involving numerous law enforcement officers, the defendant was placed in handcuffs and received medical attention.  After the shooting, law enforcement recovered from the crime scene the defendant's Taurus .40 caliber and Ruger 9-millimeter semiautomatic handguns, and a bulletproof vest with hidden holster, among other things.

On March 10, 2016, the defendant was found guilty, after a jury trial, of Counts Three through Eight of the above-captioned second superseding indictment, as follows: assaulting federal officers with a deadly weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b) (Counts Three and Four); unlawful use and possession of a firearm, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) (Count Five); and felon in possession of a firearm, fugitive in possession of a firearm, and possession of a firearm with an obliterated serial number, in violation of Title 18, United States Code, Sections 922(g)(1), (g)(2) and (k), respectively (Counts Six, Seven and Eight). The jury also found that the defendant both brandished and discharged a firearm.

## II.   Advisory Guidelines Range

On July 29, 2016, the United States Probation Department issued the PSR, which calculated the total offense level of 33, pursuant to the United States Sentencing Guidelines.  On August 2, 2016, the government submitted a letter setting forth its objections to the PSR, which is incorporated herein by reference.  Notably, the government also calculated a total Guidelines offense level of 33, however, as set forth in its letter, the government arrived at that figure by using a different legal analysis.  Accordingly, the government submits that the applicable Guidelines range of imprisonment is 135 months to 168 months plus the mandatory consecutive 120-month sentence for Count Five, resulting in a combined adjusted advisory Guidelines range of 255 months to 288 months, within Criminal History Category I.[2]

---

[2] The government also respectfully renews its request for the Court to vacate Count Seven for the purposes of sentencing and for the reasons set forth in its memorandum of law in opposition to the defendant's motions for a judgment of acquittal and for a new trial.  (See

III.     Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In doing so, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation."  United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original).  "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment."  United States v. Aldeen, 792 F.3d 247, 251-252 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct; [and]

> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to

---

ECF Docket No. 133, pp. 30-32).  Furthermore, although the government did not address this matter in its letter setting forth objections to the PSR, there is no impact to the proposed Guidelines range because of the grouping of Counts Six through Eight.

4

the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

As set forth above, to the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range.  Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

IV.   Analysis

The government respectfully submits that a sentence at the top of the Guidelines range, or above, is warranted in this case and would be a reasonable sentence within the framework of section 3553(a).

A.   Nature and Circumstances of the Offense and
     History and Characteristics of the Defendant

There is no question that the defendant's crimes are serious ones.  Firing shots at Deputy U.S. Marshals and NYPD Detectives is among the most serious crimes that any defendant can commit, showing a complete lack of respect for the lives of women and men who are sworn to uphold the law.  Indeed, among the various tasks undertaken by law enforcement officers, apprehending violent fugitives with pending drug-related charges and past convictions is particularly high risk.  Over recent years, several law enforcement officers, including Deputy U.S. Marshals, have been injured and killed during similar incidents.  Here, the Marshals' and Detectives' tactics, forbearance, and resolve – combined with good luck – resulted in no serious injuries to them, but the potential for harm was grave.

The manner in which the defendant assaulted his victims was also particularly vicious.  He was well aware that he was surrounded by law enforcement and had more than ample time to announce his presence and surrender safely without nearly taking the lives of one or more of the arresting officers.  Instead, in the time available, he chose to load his weapons, strap on a bulletproof vest, hatch a plan to distract the Deputies with false claims of a hostage situation, turn off the lights, and lay in waiting for the best moment to strike.  If all that failed – which, thankfully, it did – his contingency escape plans no doubt included

5

leaping out of his bedroom window and using the handcuff key that he secretly had taped to the inside of his belt.

Remarkably, the defendant argues that repeatedly firing at law enforcement officers from point-blank range is non-violent and that he is not a danger to the community. (See Defendant's July 6, 2016 Notice of Motion to Vacate Remand After Conviction, ECF Docket No. 140, p. 4 ("Although the offense is serious the nature of the act itself was not violent."); id., p. 5 ("Lewis is no danger to [the] community neither was he the night of his arrest.")).  This argument must be rejected in its entirety.  Violently assaulting those who protect our community is the quintessential example of being a danger to the community.

Moreover, the defendant not only denies the seriousness of his criminal conduct, he also denies responsibility for it.  Indeed, he goes even further and blames his victims for his crimes.  The defendant's utter lack of acceptance of responsibility and remorse for his actions are, perhaps, best illustrated by his own words during his closing argument:

> If I wanted to kill any of these law enforcement [sic] I had enough ammunition to complete the job in that small place. You're lucky it wasn't a real killing in that house . . . .  If it wasn't for me, you probably wouldn't be here and I would be sad, a waste, a waste, a waste of life . . . .  [W]hen you abuse your discretion that's what happens.

(T. 696:5-23) (emphasis added).  Yet, during his closing argument, the defendant went even further *still* when he turned to and directly confronted his victims: "This is why we're all here.  We're all here because of this, because of what you did."  (T. 697:11-12) (emphasis added).

B.    Need to Reflect Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Afford Adequate Deterrence

To promote respect for the law, protect the public and deter like criminal conduct, a substantial term of incarceration is appropriate in this case.  Prior to committing the instant offenses of conviction, for a period of approximately 20 years, the defendant demonstrated contempt for the law by placing it subordinate to his own personal whims and priorities.  Indeed, to this day, the defendant still apparently has no regard for the law.  For example, his lack of acceptance of responsibly speaks for itself and he offers only excuses for his past failures to appear in numerous state cases.  (See, e.g., Defendant's July 6, 2016 Notice of Motion to Vacate Remand After Conviction, ECF Docket No. 140, p. 7 ("The fact the arrest [sic] were out of state compounded the [ ] situation . . . .  The defendant acknowledges that lack of retribution for the Maryland offense and states, his three children was [sic] the primary reasons for him not making a better attempt to fix his situation.")).  Given these facts, combined with the extreme nature of the defendant's offense conduct, the

government respectfully submits that a sentence at the high end of the Guidelines range, or above, is justified.

V.      Conclusion

        For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 288 months' imprisonment, or greater.

                              Respectfully submitted,

                              ROBERT L. CAPERS
                              United States Attorney

                    By:     _____/s/_____
                              Jonathan P. Lax
                              Assistant U.S. Attorney
                              (718) 254-6139

cc:     Clerk of the Court (ILG) (by ECF)
        Oswald Lewis, Defendant (Pro Se) (by Certified Mail)
        U.S.P.O. Jeremy Neiss (by E-mail)